■ AMERICAN UNION TRANSPORT, INC., Respondent-Appellant, v JOHN J. McMULLEN ASSOCIATES, INC., Appellant-Respondent.—Order, Supreme Court, New York County, entered May 22, 1974, granting plaintiff's motion to confirm the report of the Special Referee and denying defendant's cross motion to disaffirm or modify the report of the Special Referee, unanimously modified, on the law and the facts, to the extent of disaffirming the portions of the report which found: a. The defendant negligent in regard to its estimate of March 19, 1965; b. That the defendant was not entitled to payment for work or services rendered after November 5, 1964; and c. That plaintiff was entitled to compensation for its expenses after that date; and otherwise affirmed, with $60 costs and disbursements to defendant-appellant-respondent. American Union Transport, Inc. (AUT) is an operator and owner of dry cargo vessels. John J. McMullen Associates, Inc. (McMullen), a naval architect, performed services for AUT; namely, a preliminary analysis of the technical and economic feasibility of converting specific cargo vessels to a "roll-on/roll-off" vessel used for transporting cargo trailers. In January, 1963, McMullen's president was solicited by the president of AUT to present his views with regard to construction of a new roll-on/roll-off vessel, as well as regarding conversion of an older ship to such use. The roll-on/roll-off concept permitted cargo to be transported by ship in the original land trailers rather than requiring unloading of the trailers, loading the cargo onto the ship, and then reversing the process at the port of delivery. The cargo would therefore be essentially loaded and unloaded only once and the sea leg of the trip would effectively be an extension of the overland carriage. Economic feasibility of this mode of transport required maximum speed in loading and unloading of the trailers, and the ships to be used would have to be designed with that factor in mind. The avenue of trade contemplated by AUT involved shipping of cargo between New York and Puerto Rico. Quick loading and unloading with minimal manpower as well as quick turnaround time were matters of great concern. The ship's design, therefore, had to allow for minimal deck obstruction for maneuvering the trailers on board, quick securing of the cargo on the decks, and maximizing of deck space available for cargo storage. Ultimately, three studies of the feasibility of conversion of ships for such use and the attendant costs were made by McMullen on April 15, 1963, May 21, 1964, and March 19, 1965. There was a divergence of views amongst the participants, even prior to the April, 1963 study, as to which system of loading would be most suitable, the types of lashings to be used to secure the trailers, and the crew accommodations. Overriding these problems was AUT's indecision as to the method of financing the venture. Financing was first sought through the Maritime Administration for "Title XI Mortgage Insurance." This application had to be amended when the delay in purchasing of the ship sought to be converted resulted in its being unavailable. In March, 1964, McMullen recommended two other ships as candidates for conversion. The Maritime Administration conditionally approved the amended application in August, 1964 as economically sound. AUT was warned by McMullen in the spring of 1964 that timing of the bids for the conversion was crucial and should be made by the end of 1964 in order to minimize costs. At the same time (May, 1964) a revised estimate was prepared by McMullen for submission to the Maritime Administration. Timing of bids was pivotal, since the general lack of work in the shipyards at that time meant that construction costs would be cheaper. In May, 1964 the cost outlook was still favorable. However, AUT

was still exploring different avenues of financing at the end of 1964. In fact, in February, 1965 AUT notified the Maritime Administration that it was going to use private financing and withdrew its application. In November, 1964, McMullen was authorized to prepare final contract plans. At that time there were no significant design concept changes from the May, 1964 study. In January, 1965, however, after AUT's new project manager requested numerous significant design changes, McMullen warned AUT that the cost would now be escalated. The March, 1965 estimate which then was issued by McMullen was not a detailed shipyard estimate, since no final plans and specifications were made. The March, 1965 study estimated increased costs of each vessel at approximately $500,000. The ships contemplated by AUT were not built. AUT laid the blame at McMullen's doorstep, claiming that the erroneous cost estimates were relied upon by AUT to its detriment. It refused to pay for McMullen's services. AUT sued for damages in the form of employee salaries and other expenditures during the contract period with McMullen, claiming that McMullen's misrepresentations caused it to proceed with the project to its detriment. McMullen counterclaimed for its fees. The case was scheduled for nonjury trial and it was then referred to a Special Referee to hear and report on the "liability of either party to the other." Damages issues were to be deferred until the final determination, after appellate review, of liability. The Referee reported that the first two of McMullen's estimates were proper and McMullen was entitled to compensation therefor. We concur in that portion of the report. However, the Referee found fault with the March, 1965 estimate. In this we disagree. There was no showing that the March, 1965 estimate was negligently low. While it may have varied from actual costs, it did not do so in a material, significant amount. We must keep in mind that the March, 1965 report was an estimate and *not* a cost guarantee. It could not be a guarantee since final detailed plans and specifications had not yet been drawn. Each estimate did not purport to cover total, absolute costs. Certain costs (e.g., architects' fees, additional furnishings, basic hull) were not included. Similarly, different shipyard estimates define certain capital items in varying fashions. Costs of steel in one yard do not include certain attendant structural pieces as they may in another yard. These factors were apparently known to both AUT and McMullen. Under these circumstances, McMullen's estimates were all proper. We therefore find that McMullen was entitled to compensation for services rendered in regard to all three estimates. That portion of the Referee's report finding negligence in the preparation of the March, 1965 estimate should therefore be disaffirmed. Concur—Kupferman, J. P., Silverman, Capozzoli, Lane and Nunez, JJ.